UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
──────────────────────────────────────X

AA MEDICAL,

                                Plaintiff,            Case No. 2:22-cv-01249-ENV-LGD

      v.

IRON WORKERS LOCAL 40, 361 & 471 HEALTH
FUND,

                                Defendant.
──────────────────────────────────────X

## AMENDED COMPLAINT

By way of this Complaint, Plaintiff AA Medical, P.C., ("Plaintiff") brings this action against Iron Workers Local 40, 361 & 471 Welfare Fund ("Defendant").

1.    This is an action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations, concerning Defendant's under-reimbursement of AA Medical, P.C.'s ("AA Medical") specialized orthopedic surgery.

2.    Defendant is a self-funded plan under which Plaintiff's patient was a plan participant.

3.    AA Medical was an out-of-network provider at all times relevant to this action, meaning that its surgeons did not participate in its network.

4.    On June 16, 2021, surgeon Vendant Vaksha, M.D., affiliated with AA Medical, performed a left knee meniscus root repair, left knee lateral meniscus repair, and left knee microfracture chondroplasty. After the surgery, Plaintiff submitted an invoice in the form of a CMS-1500 form as required for a total amount of $158,438.64. Defendant paid $3,473.22, leaving an unreimbursed amount of $154,965.42, which remains the responsibility of the Patient.

## JURISDICTION

5. The Court has subject matter jurisdiction over Plaintiff's ERISA claim under 28 U.S.C. § 1331 (federal question jurisdiction).

6. The Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and Defendant systematically and continuously conducts business in the State of New York, and otherwise has minimum contacts with the State of New York, and with respect to ERISA the United States, sufficient to establish personal jurisdiction over it.

7. Venue is appropriately laid in this District under 28 U.S.C. § 1391 because (a) Defendant Plan resides, is found, has an agent, and transacts business in the Eastern District of New York, (b) Defendant conducts a substantial amount of business in the Eastern District of New York, including marketing and selling self-funded group healthcare plans inside the Eastern District of New York; (c) Defendant transacts business in the Eastern District of New York by insuring individuals in the State (including the Patient) by providing its group healthcare plan to those employees who are plan participants and beneficiaries of its Plan.

8. Venue is also appropriate under 29 U.S.C. § 1132(e)(2), which requires that an ERISA plan participant has the right to bring suit where he or she resides or alleges that the violation of ERISA occurred. Plaintiff alleges that Defendant violated ERISA within the Eastern District of New York.

## PARTIES

9. AA Medical is a surgical practice group. Plaintiff's principal place of business is Stony Brook, New York.

10. Defendant is a self-funded union plan. Its principal place of business is located at 451 Park Avenue South, New York.

**FACTUAL ALLEGATIONS**

11. The patient presented with a left knee ACL tear; left knee medial meniscus, posterior tear; and left knee lateral meniscus tear, bucket handle.

12. On June 16, 2021, surgeon Vendant Vaksha, M.D. performed a left knee meniscus root repair, left knee lateral meniscus repair, and left knee microfracture chondroplasty.

13. After performing this medically necessary surgery, Plaintiff submitted an invoice in the form of a CMS-1500 form as required for a total amount of $158,438.64. Defendant paid $3,473.22, leaving an unreimbursed amount of $154,965.42, which remains the responsibility of the Patient.

14. In its Explanation of Benefits ("EOB"), constituting its Adverse Benefit Determination, Defendant represented that the operative report did not describe any lesion in the knee that would require a microfracture chondroplasty.

15. This was a false conclusion of the medical necessity of the microfracture chondroplasty, which is an integral part of the meniscal repair. Defendant, relying on a third-party, MedReview, did not conclude that the procedure was experimental and investigational, nor did it state that it was coded incorrectly.

16. The microfracture chondroplasty was medically necessary for the patient.

17. The meniscus tear suffered by the patient was a lesion. The patient had a left knee injury. The MRI showed a tear of the Anterior Cruciate Ligament (ACL) and the medial and lateral meniscus.

18. The surgeon performed a meniscus repair and microfracture chondroplasty in the non-weight bearing area of the articular cartilage (intercondylar notch) to allow the bone barrow to seep into the joint. Microfracture chondroplasty was medically necessary to allow for healing of the meniscus repair.

19. The medical literature demonstrates the medical necessity of the microfracture chondroplasty in the presence of a meniscus tear. There is substantial evidence in the medical literature that bone marrow venting by performing a microfracture chondroplasty in the intercondylar notch has superior rates of meniscus healing in the setting of meniscus repair. It is a standard procedure to perform a microfracture chondroplasty with meniscus repair surgery.

20. Numerous peer-reviewed studies confirm the medical necessity of microfracture chondroplasty to augment meniscus repair.

21. In Freedman, "Marrow Stipulating Technique to Augment Meniscus Repair," *Arthroscopy*, 2003 Sept; 19(7): 794-98, the authors concluded that the "simple arthroscopic technique of microfracture to the intercondylar notch . . . can provide marrow elements to the site of meniscus repair to aid in meniscal healing at the time of repair."

22. In Kaminski, "Repair Augmentation of Unstable, Complete Vertical Meniscal Tears with Bone Marrow Venting Procedure: A Prospective, Randomized Double-Blind, Parralel Group, Placebo-Controlled Study," *Arthroscopy*, 2019 May; 35(5): 1500-1508, the authors concluded: "Our blinded, prospective, randomized, controlled trial on the role of BMVP [Bone Marrow Venting Procedure] augmentation in meniscus repair, indicates that BMVP augmentation results in a significant improvement in the rate of meniscus healing."

23. In Girolamo, "Why Menisci Show Higher Healing Rate When Repaired during ACL Reconstruction? Growth Factors Release Can be the Explanation," *Knee Surg. Sports Tramatol Arthros.* 2015 Jan; 23(1): 90-96, the authors concluded: "PDGF [Platelet-Derived Growth Factor] can play an important role in enhancing the healing response of meniscus suture and can be one of the biological reasons of the higher meniscal healing rate in anterior cruciate ligament reconstructed knee."

24. The medical literature demonstrates that the microfracture chondroplasty performed on the patient was consistent with the patient's symptoms, in accordance with good medical practice, not solely for the convenience of the patient, and the most appropriate level of service that can safely be provided to the patient. If the microfracture chondroplasty is not performed and the meniscus repair fails, the patient may need secondary repair surgery, including the need to repeat the meniscus repair surgery or a meniscus transplant. This will result in a complicated postoperative course for the patient with the potential need for a total knee replacement.

25. Defendant's MedReview denial did not rely on this medical literature and did not raise any substantial evidence to the contrary. Accordingly, Defendant's denial was arbitrary and capricious.

26. The MedReview Report also stated that it was "not typical" for the procedure to require two assistants, and concludes that "One operative assistant is customary, usual and reasonable."

27. Dr. Vaksha was not the assistant surgeon in the case. He was the operating surgeon.

28. Plaintiff sent an appeal to Defendant on December 15, 2021.

29. Defendant refused to respond to the appeal.

30. Surgical services are a covered service under the Plan.

31. The Plan pays for out-of-network surgical services based on the 60th percentile of Fair Health. Plaintiff seeks this reimbursement under the Plan from Defendant.

32. Plaintiff exhausted its administrative remedies. Alternatively, the appellate process was futile and Plaintiff was deemed to have exhausted its administrative remedies.

33. When Defendant denied Plaintiff's claims, it did not do so pursuant to the rules promulgated under ERISA.

34. 29 C.F.R. § 2560.503-1(g) provides as follows:

Manner and content of notification of benefit determination. (1) The plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520 2520.104b-1(c)(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant -

(i) The specific reason or reasons for the adverse determination;
(ii) Reference to the specific plan provisions on which the determination is based;
(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;
(v) In the case of an adverse benefit determination by a group health plan - (A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

35. Defendant did not provide the information required by 29 C.F.R. § 2560.503-1(g), in violation of ERISA and the rules promulgated thereunder.

36. Specifically, in its EOB Defendant failed to refer Plaintiff to the specific plan provisions on which the determination was based; describe any additional material or information necessary for Plaintiff to perfect the claim and an explanation of why such material or information is necessary; describe the plan's review procedures and the time limits applicable to such procedures, including a statement of Plaintiff's right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review; and the specific rule, guideline, protocol, or other similar criterion used and that it may be requested free of charge.

37. Deemed exhaustion is set out in 29 C.F.R. § 2560-503-1, which states:

[I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

6

38. Plaintiff received an assignment from the Patient. It states, in pertinent part:

I hereby assign and convey all benefit and non-benefit rights, including the rights under my health insurance policy or benefit plan to AA Medical, P.C. with respect to all medical services provided by AA Medical, P.C. and its surgeons or providers for all dates of service. It is specifically intended by this assignment of benefits to assign all of my rights to bring any appeal, lawsuit, or administrative proceeding for any on my behalf, in my name against any person or entity involved in the determination of benefits under my insurance policy or benefits plan, including any fiduciary claim.

## COUNT I

### CLAIM AGAINST DEFENDANT FOR UNPAID BENEFITS UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA

39. Defendant is obligated to pay benefits to its Plan participants and beneficiaries in accordance with the terms of Defendant's Plan, and in accordance with ERISA.

40. Defendant violated its legal obligations under this ERISA-governed Plan when it under-reimbursed Plaintiff for the surgery provided to the Patient by Plaintiff, in violation of the terms of the Plan and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

41. Plaintiff submitted an invoice for $158,438.64.

42. Defendant paid $3,473.22, leaving an unreimbursed amount of $154,965.42.

43. Plaintiff seeks unpaid benefits and statutory interest back to the dates Plaintiff's claims were originally submitted to Defendant. It also seeks attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant.

WHEREFORE, Plaintiff demands judgment in its favor against Defendant as follows:

(a) Ordering Defendant to recalculate and issue unpaid benefits to Plaintiff;

(b) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees under ERISA, and costs and expenses in amounts to be determined by the Court;

(c) Awarding prejudgment interest; and

(d) Granting such other and further relief as is just and proper.

Dated: January 24, 2023

/s/ Robert J. Axelrod
AXELROD LLP
1465 Fifth Avenue, No. 7D
New York, NY 10035
(646) 986-4444
raxelrod39@gmail.com

*Attorney for Plaintiff AA Medical, P.C.*