UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
A.A. MEDICAL P.C., : Case No.:2:22-cv-01249(ENV)(LGD)
                           Plaintiff, :
    -against- :
  : **RULE 56.1 STATEMENT**
IRON WORKERS LOCALS 40, 361 & 417 : **OF MATERIAL FACTS**
HEALTH FUND, :
                           Defendant. :
-------------------------------------------------------------------------X

        Defendant, Iron Workers Locals 40, 361 and 417 Health Fund ("Defendant" or the "Fund"), by its attorneys, COLLERAN, O'HARA & MILLS, L.L.P., hereby provide the following statement of Undisputed Material Facts:

    **A. The Fund**

    1.    The Fund is a self-insured, self-funded multi-employer benefit plan within the meaning of Section 3(2) and 3(37) of ERISA. 29 U.S.C. §§ 1002(2) and (37). (Sabbagh Decl. at ¶ 2).

    2.    The participants in the Fund are members of Iron Workers Locals 40, 361, or 417 (the "Unions"). (Sabbagh Decl. at ¶ 3).

    3.    The Fund is administered by a Board of Trustees who are the fiduciaries of the Fund, with half of the Trustees appointed by the Unions and half appointed by contributing employers. (See Sabbagh Decl., Ex. A, Trust Agreement at p. 4).

    4.    The Restated Trust Agreement effective February 1, 1976 (the "Trust Agreement"), which governs the Fund, states that the Board of Trustees is given the "exclusive power" to determine what benefits the Fund provides. (Sabbagh Decl., Ex. A, Trust Agreement at p. 7).

    5.    The Trust Agreement also permits the Trustees to "delegate any of their ministerial or administrative powers or duties to agents, employees, or others…" (Sabbagh Decl., Ex. A, Trust

Agreement at p. 9). The application of plan rules to determine eligibility, the calculation of benefits, and the processing of claims are considered "purely ministerial functions" and can be properly delegated. 29 C.F.R. § 2509.75-8. In this case, the Trustees have delegated these responsibilities to the Fund Administrator and Fund employees. (Sabbagh Decl. at ¶ 5).

6. The Summary Plan Description ("SPD") details all benefits that are provided by the Plan and how these benefits are paid. (Sabbagh Decl. at ¶ 7). The Plan Administrator, Trustees, and any individual who has been delegated the administration of the Plan for the Fund have "discretionary authority to determine…eligibility and entitlement to Plan Benefits in accordance with the terms of the Plan." (Sabbagh Decl. Ex. B, SPD at p. 80). The Plan provides that participants may choose any doctor their choose but can only provide lower costs when a participant chooses providers are "in-network." (Sabbagh Decl., Ex. B, SPD at p. 76).

7. The Plan further provides that "[o]nce the Plan makes payment on a claim, no further payment will be made." (Sabbagh Decl., Ex. B, SPD at p 102). An appeals procedure for participants or their providers to follow is also provided for in the SPD in the event benefits are disputed. The SPD clearly explains its position with regard to out-of-network providers, such as Plaintiff. The SPD states:

If you use an Out-of-Network provider, the Plan will pay 60% of the Plan's **allowed amount** charges of your Covered Medical Expenses after you have met your deductible. You will be responsible for paying 40% of the charges.

Once you have paid reasonable and customary charges of up to $5,000 in addition to your deductible, the Plan will pay the rest of your covered expenses at 100% of the Plan's Scheduled Allowance charges for the remainder of the calendar year. (Sabbagh Decl., Ex. B, SPD at p. 76).

2

8. For out-of-network claims, the Fund's schedule of allowances is compiled by FAIR Health, a third-party vendor and non-profit organization, which collects a database of claims to determine what providers charge and what insurers pay for healthcare, and then further groups the claims by geographic area. (Sabbagh Decl. at ¶ 8). Those charges by geographic area are then organized into percentiles. (Id.). For example, if a provider's price in a certain geographic area is in the 80th percentile for a particular service, that means 80 percent of the fees billed by other providers for the same service were that amount or lower. (Id.).

### B. A.A. Medical, P.C.

9. Plaintiff is a surgical practice group with a principal place of business in Stony Brook, New York. (Am. Compl. at ¶ 9). Plaintiff does not have an in-network contract with the Plan. (Am. Compl. at ¶ 3). On June 16, 2021, Plaintiff's medical professionals performed arthroscopic knee surgery on their patient, a non-party participant in the Fund. (Am. Compl. at ¶ 12). Plaintiff submitted an invoice in the form of a CMS-1500 form for a total amount of $158,438.64. (Am. Compl. at ¶ 13). Defendant paid $3,473.22. (Id.). Defendant's Explanation of Benefits ("EOB") stated "that the operative report did not describe any lesion in the knee that would require a microfracture chondroplasty." (Am. Compl. at ¶ 14).

### C. Plaintiff's Claim for Medical Services

10. In the instant matter, Plaintiff sought pre-approval for two (2) procedures before treating the patient. (Sabbagh Decl. at ¶ 12). Specifically, Plaintiff sought pre-approval for procedure identified 29883 and procedure 2988. *Id.* The Fund approved both procedures. *Id.*

11. On June 16, 2021, Plaintiff performed one of the pre-approved procedures, identified as 29883. Plaintiff also performed a separate procedure for which it had not sought pre-approval, identified as procedure 29879.

3

12. Plaintiff billed the Fund, $99,756.32 and $58,682.32 for procedures 29883 and 29879. The Fund, in making its determination of benefits and coverage for this procedure, reviewed the applicable FAIR Health schedule of allowances for out-of-network coverage. (Sabbagh Decl. at ¶ 8). As the Plan provides for payment of 60% of the scheduled allowance for out-of-network claims, the FAIR Health schedule of allowances shows that Defendant properly followed the Plan in paying Plaintiff based on same. As demonstrated on the FAIR Health schedule of allowances below, under the 60th percentile the rate is $5,668.09 for procedure code 29883. This was the applicable allowances in place as of the date of the claim, and matches the amount paid to Plaintiff. (See Sabbagh Decl., Exs. F, Schedule of Allowances).

13. For procedure 29883, Plaintiff billed the Fund a total of $99,756.32, approximately five (5) times the allowable rate paid at the 100th percentile. For procedure 29879, which was not-preapproved, Plaintiff billed the Fund a total of $58,687.32, which is approximately five and one-half (5.5) times the allowable rate paid at the 100th percentile. (See Sabbagh Decl., Exs. C-D, Claims Report and Forms, Schedule of Allowances).

14. With respect to the code 29888 procedure, the Fund's independent medical reviewer determined that the procedure was not medically necessary. (Sabbagh Decl. at ¶ 13). Therefore, no payment was made for that procedure. The Fund's SPD defines Medically Necessary Treatment as treatment that are:

- Consistent with the symptoms or diagnosis and treatment of the patient's condition, illness or injury,
- In accordance with standard of good medical practice,
- Not solely for the convenience of the patient, the physician or other provider,

4

- Not primarily custodial, and
- The most appropriate level of service that can be safely provided to the patient.

(See Ex. B to Sabbagh Decl. SPD at p. 75).

Dated: Woodbury, New York
January 16, 2025

          COLLERAN, O'HARA & MILLS L.L.P.
          *Attorneys for Defendant*

By: _____
THOMAS P. KEANE (TK 4425)
100 Crossway Park Drive West, Suite 200
Woodbury, New York 11797
(516) 248-5757
tpk@cohmlaw.com

5