# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————————X

AA MEDICAL,

                         Plaintiff,            Case No. 2:22-cv-01249-ENV-LGD

              v.

IRON WORKERS LOCAL 40, 361 & 471 HEALTH
FUND,

                         Defendant.

——————————————————————————X

## **AMENDED COMPLAINT**

By way of this Complaint, Plaintiff AA Medical, P.C., ("Plaintiff") brings this action against Iron Workers Local 40, 361 & 471 Welfare Fund ("Defendant").

1.      This is an action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations, concerning Defendant's under-reimbursement of AA Medical, P.C.'s ("AA Medical") specialized orthopedic surgery.

2.      Defendant is a self-funded plan under which Plaintiff's patient was a plan participant.

3.      AA Medical was an out-of-network provider at all times relevant to this action, meaning that its surgeons did not participate in its network.

4.      On June 16, 2021, surgeon Vendant Vaksha, M.D., affiliated with AA Medical, performed a left knee meniscus root repair, left knee lateral meniscus repair, and left knee microfracture chondroplasty.  After the surgery, Plaintiff submitted an invoice in the form of a CMS-1500 form as required for a total amount of $158,438.64. Defendant paid $3,473.22, leaving an unreimbursed amount of $154,965.42, which remains the responsibility of the Patient.

1

## JURISDICTION

5.      The Court has subject matter jurisdiction over Plaintiff's ERISA claim under 28 U.S.C. § 1331 (federal question jurisdiction).

6.      The Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and Defendant systematically and continuously conducts business in the State of New York, and otherwise has minimum contacts with the State of New York, and with respect to ERISA the United States, sufficient to establish personal jurisdiction over it.

7.      Venue is appropriately laid in this District under 28 U.S.C. § 1391 because (a) Defendant Plan resides, is found, has an agent, and transacts business in the Eastern District of New York, (b) Defendant conducts a substantial amount of business in the Eastern District of New York, including marketing and selling self-funded group healthcare plans inside the Eastern District of New York; (c) Defendant transacts business in the Eastern District of New York by insuring individuals in the State (including the Patient) by providing its group healthcare plan to those employees who are plan participants and beneficiaries of its Plan.

8.      Venue is also appropriate under 29 U.S.C. § 1132(e)(2), which requires that an ERISA plan participant has the right to bring suit where he or she resides or alleges that the violation of ERISA occurred. Plaintiff alleges that Defendant violated ERISA within the Eastern District of New York.

## PARTIES

9.      AA Medical is a surgical practice group. Plaintiff's principal place of business is Stony Brook, New York.

10.     Defendant is a self-funded union plan. Its principal place of business is located at 451 Park Avenue South, New York.

2

## FACTUAL ALLEGATIONS

11. The patient presented with a left knee ACL tear; left knee medial meniscus, posterior tear; and left knee lateral meniscus tear, bucket handle.

12. On June 16, 2021, surgeon Vendant Vaksha, M.D. performed a left knee meniscus root repair, left knee lateral meniscus repair, and left knee microfracture chondroplasty.

13. After performing this medically necessary surgery, Plaintiff submitted an invoice in the form of a CMS-1500 form as required for a total amount of $158,438.64. Defendant paid $3,473.22, leaving an unreimbursed amount of $154,965.42, which remains the responsibility of the Patient.

14. In its Explanation of Benefits ("EOB"), constituting its Adverse Benefit Determination, Defendant represented that the operative report did not describe any lesion in the knee that would require a microfracture chondroplasty.

15. This was a false conclusion of the medical necessity of the microfracture chondroplasty, which is an integral part of the meniscal repair. Defendant, relying on a third-party, MedReview, did not conclude that the procedure was experimental and investigational, nor did it state that it was coded incorrectly.

16. The microfracture chondroplasty was medically necessary for the patient.

17. The meniscus tear suffered by the patient was a lesion. The patient had a left knee injury. The MRI showed a tear of the Anterior Cruciate Ligament (ACL) and the medial and lateral meniscus.

18. The surgeon performed a meniscus repair and microfracture chondroplasty in the non-weight bearing area of the articular cartilage (intercondylar notch) to allow the bone barrow to seep into the joint. Microfracture chondroplasty was medically necessary to allow for healing of the meniscus repair.

19.     The medical literature demonstrates the medical necessity of the microfracture chondroplasty in the presence of a meniscus tear.  There is substantial evidence in the medical literature that bone marrow venting by performing a microfracture chondroplasty in the intercondylar notch has superior rates of meniscus healing in the setting of meniscus repair.  It is a standard procedure to perform a microfracture chondroplasty with meniscus repair surgery.

20.     Numerous peer-reviewed studies confirm the medical necessity of microfracture chondroplasty to augment meniscus repair.

21.     In Freedman, "Marrow Stipulating Technique to Augment Meniscus Repair," *Arthroscopy*, 2003 Sept; 19(7): 794-98, the authors concluded that the "simple arthroscopic technique of microfracture to the intercondylar notch . . . can provide marrow elements to the site of meniscus repair to aid in meniscal healing at the time of repair."

22.     In Kaminski, "Repair Augmentation of Unstable, Complete Vertical Meniscal Tears with Bone Marrow Venting Procedure: A Prospective, Randomized Double-Blind, Parralel Group, Placebo-Controlled Study," *Arthroscopy*, 2019 May; 35(5): 1500-1508, the authors concluded: "Our blinded, prospective, randomized, controlled trial on the role of BMVP [Bone Marrow Venting Procedure] augmentation in meniscus repair, indicates that BMVP augmentation results in a significant improvement in the rate of meniscus healing."

23.     In Girolamo, "Why Menisci Show Higher Healing Rate When Repaired during ACL Reconstruction? Growth Factors Release Can be the Explanation," *Knee Surg. Sports Tramatol Arthros.* 2015 Jan; 23(1): 90-96, the authors concluded: "PDGF [Platelet-Derived Growth Factor] can play an important role in enhancing the healing response of meniscus suture and can be one of the biological reasons of the higher meniscal healing rate in anterior cruciate ligament reconstructed knee."

24. The medical literature demonstrates that the microfracture chondroplasty performed on the patient was consistent with the patient's symptoms, in accordance with good medical practice, not solely for the convenience of the patient, and the most appropriate level of service that can safely be provided to the patient. If the microfracture chondroplasty is not performed and the meniscus repair fails, the patient may need secondary repair surgery, including the need to repeat the meniscus repair surgery or a meniscus transplant. This will result in a complicated postoperative course for the patient with the potential need for a total knee replacement.

25. Defendant's MedReview denial did not rely on this medical literature and did not raise any substantial evidence to the contrary. Accordingly, Defendant's denial was arbitrary and capricious.

26. The MedReview Report also stated that it was "not typical" for the procedure to require two assistants, and concludes that "One operative assistant is customary, usual and reasonable."

27. Dr. Vaksha was not the assistant surgeon in the case. He was the operating surgeon.

28. Plaintiff sent an appeal to Defendant on December 15, 2021.

29. Defendant refused to respond to the appeal.

30. Surgical services are a covered service under the Plan.

31. The Plan pays for out-of-network surgical services based on the 60th percentile of Fair Health. Plaintiff seeks this reimbursement under the Plan from Defendant.

32. Plaintiff exhausted its administrative remedies. Alternatively, the appellate process was futile and Plaintiff was deemed to have exhausted its administrative remedies.

33. When Defendant denied Plaintiff's claims, it did not do so pursuant to the rules promulgated under ERISA.

34. 29 C.F.R. § 2560.503-1(g) provides as follows:

5

Manner and content of notification of benefit determination. (1) The plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520 2520.104b-1(c)(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant -

(i) The specific reason or reasons for the adverse determination;

(ii)      Reference to the specific plan provisions on which the determination is based;
   (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv)      A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v)      In the case of an adverse benefit determination by a group health plan - (A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

35.      Defendant did not provide the information required by 29 C.F.R. § 2560.503-1(g), in violation of ERISA and the rules promulgated thereunder.

36.      Specifically, in its EOB Defendant failed to refer Plaintiff to the specific plan provisions on which the determination was based; describe any additional material or information necessary for Plaintiff to perfect the claim and an explanation of why such material or information is necessary; describe the plan's review procedures and the time limits applicable to such procedures, including a statement of Plaintiff's right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review; and the specific rule, guideline, protocol, or other similar criterion used and that it may be requested free of charge.

37.      Deemed exhaustion is set out in 29 C.F.R. § 2560-503-1, which states:

[I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

38.     Plaintiff received an assignment from the Patient.  It states, in pertinent part:

I hereby assign and convey all benefit and non-benefit rights, including the rights under my health insurance policy or benefit plan to AA Medical, P.C. with respect to all medical services provided by AA Medical, P.C. and its surgeons or providers for all dates of service. It is specifically intended by this assignment of benefits to assign all of my rights to bring any appeal, lawsuit, or administrative proceeding for any on my behalf, in my name against any person or entity involved in the determination of benefits under my insurance policy or benefits plan, including any fiduciary claim.

## COUNT I

### CLAIM AGAINST DEFENDANT FOR UNPAID BENEFITS
### UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA

39.     Defendant is obligated to pay benefits to its Plan participants and beneficiaries in accordance with the terms of Defendant's Plan, and in accordance with ERISA.

40.     Defendant violated its legal obligations under this ERISA-governed Plan when it under-reimbursed Plaintiff for the surgery provided to the Patient by Plaintiff, in violation of the terms of the Plan and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

41.     Plaintiff submitted an invoice for $158,438.64.

42.     Defendant paid $3,473.22, leaving an unreimbursed amount of $154,965.42.

43.     Plaintiff seeks unpaid benefits and statutory interest back to the dates Plaintiff's claims were originally submitted to Defendant. It also seeks attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant.

WHEREFORE, Plaintiff demands judgment in its favor against Defendant as follows:

(a)     Ordering Defendant to recalculate and issue unpaid benefits to Plaintiff;

(b)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees under ERISA, and costs and expenses in amounts to be determined by the Court;

(c)     Awarding prejudgment interest; and

(d)     Granting such other and further relief as is just and proper.

Dated: January 24, 2023

/s/ Robert J. Axelrod
AXELROD LLP
1465 Fifth Avenue, No. 7D
New York, NY 10035
(646) 986-4444
raxelrod39@gmail.com

*Attorney for Plaintiff AA Medical, P.C.*

# EXHIBIT B

Case 2:22-cv-01249-SJB-LGD    Document 84-1    Filed 03/31/26    Page 11 of 30 PageID #: 998

**Clinical Documents**



**St. Catherine of Siena
Medical Center**
Catholic Health Services
At the heart of health

**ST CATHERINE OF SIENA
SMITHTOWN, NEW YORK**

**REPORT OF OPERATION**

E1813629
BRIAN SIDOTE
3034455730

PT TYPE:

LOCATION:          SGS

PATIENT'S NAME:  Sidote, Brian

DATE OF PROCEDURE:  06/16/2021

DATE OF BIRTH:  04/16/1987

SURGEON:  Vedant Vaksha, MD

ASSISTANTS:
1. Patrick Greger, PA
2. Brian James, PA

PREOPERATIVE DIAGNOSES:
1. Left knee ACL tear.
2. Left knee medial meniscus, posterior horn tear.
3. Left knee lateral meniscus tear, bucket handle.

POSTOPERATIVE DIAGNOSES:
1. Left knee medial meniscus root tear.
2. Left knee bucket handle lateral meniscus tear with the left knee ACL tear.

OPERATIONS:
1. Left knee medial meniscus root repair.
2. Left knee lateral meniscus repair.
3. Left knee microfracture chondroplasty.

COMPLICATIONS:  None.

SPECIMENS:  Shavings.

TOURNIQUET TIME:  127 minutes.

BLOOD LOSS:  50 cc.

INDICATION FOR PROCEDURE:  The patient is a 34-year-old male who came to my office following injury to the left knee in a kickball game.  He came in with a swollen knee.  I aspirated the knee and drained blood from the knee.  The patient was sent for MRI, which showed the above-mentioned findings.  We discussed treatment options and the patient

BRIAN SIDOTE
E1813629
3034455730

opted for surgical management. We discussed possibility of need for repair versus resection of the medial and lateral meniscus and possibility of repair versus reconstruction of ACL tear found one. We also discussed the possibility of staging the procedure if the meniscus repair was prolonged. We also discussed risks and benefits including infection, bleeding, injury to adjacent nerves and vessels, rehabilitation, need for repeat surgery, failure, staging procedure, knee stiffness, and need for manipulation, need for rehabilitation, systemic complications including blood clot, cardiac or pulmonary, neurological complications including death. The patient understood and signed an informed consent.

DESCRIPTION OF PROCEDURE: The patient was taken to the operating room where general anesthesia was induced. The left lower extremity was prepped and draped aseptically in usual fashion. Preop antibiotic was given. A gram of tranexamic acid was also given. Timeout was called. Tourniquet was elevated after exsanguination.

Lateral entry portal was made for the arthroscope. Arthroscope was entered. There was hemarthrosis, this was drained. Medial entry portal was made with use of spinal needle. Examination of the medial tibiofemoral compartment showed tear of the posterior horn meniscus, which was freed. The portion of the meniscus was resected. Further examination showed that the root was avulsed and tagged by only the capsular attachment.

Decision was done to root repair. Examination of the intercondylar notch showed tear of the ACL with synovial reaction. Examination of the lateral tibiofemoral compartment showed a bucket handle tear, which was into the intercondylar notch. There was also a flap along the posterior horn of the medial meniscus in a form of a tongue. The decision was done to repair the meniscus. Posterolateral incision was given along the posterolateral corner of the knee. With sharp and blunt dissection along the posterior margin of the LCL, the knee capsule was reached. A space was generated between the gastrocnemius and the knee capsule. A speculum was inserted to avoid injury to the neurovascular bundle posterior to the knees.

Now, the repair of lateral meniscus was planned. Combination of FastFixes as well as Ti-Cron needle sutures should pass through _____ specific cannulas were done. The repair also involved tying down the tongue fragment along with the bucket handle fragment. The meniscal soft tissues were prepared before the repair with the use of shaver and rasp. All the three Ti-Cron needles could have been passed along with the use of six FastFixes for all inside repair. The Ti-Cron needle was delivered out of the posterolateral wound. Pictures were taken and saved.

Now, the scope was entered into the medial portal to complete the repair of the lateral meniscus. The repair of the medial root was performed through the medial portal and the scope in the lateral portal.

# EXHIBIT C

# EXHIBIT C

# NYCHSRO/MedReview

*Clinical Review Report Prepared For:*     **Ironworkers Health and Welfare Fund**

*Mbr / DOB / Age:*     Brian  Sidote  4/16/87  [ 34 ]

*ID # / Gender:*     MID0024054   M          *First/Last Svc Dates:*

*Referral Date:*     June 4, 2021               *CRS Reference #:*     203870

*Review Date:*     June 7, 2021               *Reviewer(s):*     David Lessing, M.D.
                                                               Orthopedic Surgery
*Claim #:*

*Case / Auth #:*                                                [-],

*LOB / Group ID:*

*Case Type:*     Medical Necessity

*Determination:*     Certified [Approved]

## IRO CONSULTANT RESPONSE

### Review Issue(s) /Questions:

1.      Medical necessity: Is the planned treatment, left knee meniscus repair and ACL repair vs. reconstruction, medically necessary? Please reference established criteria or guidelines or practice norms and provide relevant references.

2.      Coding: Are the submitted CPT codes an accurate coding for this treatment? If additional or different coding is indicated, please provide those appropriate codes as well.

Submitted CPT Codes: 29883; 29888.

### Materials Reviewed:

From 05/28/21 through 06/04/21 Dr.Vaksha provides orthopedic treatment notes for a left knee injury sustained playing kickball on 05/25/21. Patellar and medial and lateral joint line tenderness were noted in addition to an effusion. The effusion was aspirated and found to be a hemarthrosis. An MRI study was obtained that documented a medial meniscal tear in the posterior horn with a bucket handle tear in the lateral meniscus and a deficient anterior cruciate ligament. A subsequent evaluation on 06/04/21 revealed persistent medial and lateral joint line tenderness with limited range of motion and a positive Lachman's test and McMurray's test. Treatment options were discussed and arthroscopy of the left knee with medial and lateral meniscal repair with ACL repair versus reconstruction was the agreed treatment plan.

On 06/02/21 Zwanger-Pesiri Radiology provides a report of an MRI study of the left knee. The study notes a moderate effusion with a grade 2 sprain of the medial collateral ligament, a vertical tear to the inner third of the posterior horn of the medial meniscus, a bucket handle tear of the lateral meniscus, and a subacute ACL tear partial versus (more likely) complete.

### Response to Review Questions:

# NYCHSRO/MedReview

*Clinical Review Report Prepared For:*    **Ironworkers Health and Welfare Fund**

1)

The proposed arthroscopy of the left knee with meniscal repair and cruciate repair/reconstruction is indicated.

2)

The submitted CPT codes accurately describe the proposed procedure.

### Clinical Synopsis and Rationale:

Although the radiology report refers to this is a subacute ACL injury, the history and finding of an effusion with blood in the knee (hemarthrosis) indicates that this is an acute injury and within reasonable medical probability related to the kickball injury described on May 25, 2021. Treatment notes reflect a positive Lachman test indicating that the knee is clinically unstable, and the MRI also documents tears of both medial and lateral menisci. The menisci are secondary stabilizers for the anterior cruciate ligament and cruciate repair/reconstruction carries a high failure rate without repairing those secondary stabilizers. Accordingly, both menisci need to be repaired to protect the repair/reconstruction of the ACL. The ACL needs to be repaired or reconstructed to provide stability for the knee.

CPT code 29883 refers to arthroscopy and repair of both the medial and lateral menisci which is an accurate description of the indicated procedure.

CPT code 29888 refers to his surgical repair/reconstruction of the anterior cruciate ligament, which is also indicated.

### Recommendation:

I recommend proceeding with the surgery as described with the CPT codes listed above.

### References:

Milliman guidelines S-705 (ISC) were referenced in providing this report.

### Conflict of Interest Attestation:

**I hereby attest** that I have examined the materials provided to me and that I have no conflict of interest (as defined above or otherwise) regarding:
· the referring entity
· the health benefit plan / insurer or any officer, administrator, fiduciary, director or employee of same
· the patient / consumer / covered person or that person's authorized representative (if the representative's identity is known)
· the requesting provider, provider's group or IPA or any other healthcare provider previously involved in the case

# NYCHSRO/MedReview

*Clinical Review Report Prepared For:*    **Ironworkers Health and Welfare Fund**

· the facility at which the recommended treatment would be provided
· the developer or manufacturer of the principal drug, device, procedure, or other therapy being recommended for the patient

**I further attest** that I will not accept compensation for external review activities that are dependent on any way on the specific outcome of the case nor is my decision in any way based on consideration of race, religion, national origin, gender nor on the basis of any other non-clinical personal factor and that I do not have any history of involvement with this case or episode of care prior to its referral to me on this occasion.

*Reviewer Name:*

David Lessing, M.D.

*Board Certification:*

Orthopedic Surgery

# NYCHSRO/MedReview

## Reviewer Credentials For Case  #203870

*Mbr / DOB / Age:*   Brian  Sidote  4/16/87  *[ 34 ]*

*ID # / Gender:*   MID0024054  M          *First/Last Svc Dates:*

*Referral Date:*   June 4, 2021

*Review Date:*   June 7, 2021

*Claim #:*

*Case / Auth #:*

**Board Certification (if applicable)**                     **Lic. State/#/Status/Expires**
*Specialty / Status / Expiration*
*[Exp Date of 12/31/2999 = Lifetime Cert.]*

### David Lessing, M.D.

| | | | | |
|---|---|---|---|---|
| Orthopedic Surgery | NJ | 25MA0479030 | Active | 06/30/2021 |
| *Certified* | NY | 138547 | Active | 05/31/2022 |
| *12/31/2026* | | | | |

[-],

---

*Case #203870*                                                                 *Form 118*

# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
AA MEDICAL, P.C.,

                  Plaintiff,

        v.

IRON WORKERS LOCALS 40, 361 &
417 HEALTH FUND,

                  Defendant.
------------------------------------------------------X

Case No. 2:22-cv-01249-ENV-LGN

## DECLARATION OF VEDANT VAKSHA, M.D. IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Vedant Vaksha, M.D., pursuant to 28 U.S.C. § 1746(2), declares under penalty of perjury that the foregoing is true and correct:

1. I am Vedant Vaksha, M.D., the orthopedic surgeon who performed surgery on the patient in this case. On June 16, 2021, I performed a left knee meniscus root repair, left knee lateral meniscus repair, and left knee microfracture chondroplasty.

2. I am a fellowship trained orthopedic surgeon with experience of over 20 years in orthopedics. I am fellowship trained in sports medicine and arthroscopic surgery as well as spine surgery. I have been practicing in New York for four years with privileges in multiple hospitals across healthcare systems, namely Northwell Health, Catholic Health System of Long Island, and Mount Sinai. I have multiple presentations and televised appearances in the past many years.

3. I understand that Defendant Ironworkers denied the microfracture chondroplasty billed as CPT Code 29879 as not medically necessary. Defendant did not, however, conclude that this procedure was experimental and investigational. Nor did it state that it was coded incorrectly. It did not provide any medical literature to support its position. I will show in my Declaration that the microfracture chondroplasty was medically necessary and supported by the record – the operative report that was supplied to Defendant.

4. I have seen a document from a company called "MedReview" as an exhibit in this case, Exh. D. It states: "The operative report describes performing a microfracture chondroplasty representing CPT code 29879. The operative report does not describe any lesion in the knee that would require a microfracture chondroplasty."

5. It is my medical opinion that this represents a false conclusion on the part of the reviewer. The Patient had a left knee injury while playing kickball, following which he went to a hospital and was later seen in my office. He got an MRI done which showed a tear of the Anterior Cruciate ligament (ACL) and medial and lateral meniscus. Considering his young age and good general health, we agreed to do repair of the ACL as well as both meniscus as that would give him the best chance to preserve the anatomy of his knee and avoid development of osteoarthritis in the knee over the long term and allow him recreational activities with no or minimal discomfort. His surgery was planned electively. During the procedure the MRI findings were confirmed, and the decision was made to go as planned. Repair of both lateral meniscus was performed with inside out technique and that of medial meniscus root was also performed. This surgery is done under a tourniquet to have a bloodless field of surgery. The procedure of repair took more than 100 minutes of tourniquet time. The repair of the ACL would have needed more

tourniquet time which would have been detrimental and would possibly jeopardize the vascularity of the leg. Considering that it was decided to carry out the ACL reconstruction as a staged procedure. Medical literature has shown that the meniscus repairs done along marrow venting procedure have a higher rate of success and healing. Hence it was decided to carry out microfracture chondroplasty in the non-weight bearing area of the articular cartilage (intercondylar notch) to allow the marrow (seen as fat globules and blood) to seep into the joint. ACL reconstruction was later performed after four weeks as a staged procedure.

6. We billed microfracture chondroplasty performed in the intercondylar notch to allow healthy bone marrow to vent out into the knee joint so as to allow good and early healing of the meniscus repair. Microfracture chondroplasty was not done for any particular articular cartilage lesion (which the MedReview report wrongly stated) but the sole purpose of allowing an early healing of the meniscus repair by the help of the growth factors from the bone marrow cells that enter from these micro fracture sites and bathe the joint specifically in the region of meniscus repair. These healing growth factors are necessary for early and higher rate of meniscus healing and to avoid secondary surgeries.

7. The medical literature shows that this marrow venting procedure is important in early and higher healing rates in the presence of meniscus tears. There has been substantial evidence in the medical literature that bone marrow venting by performing microfracture chondroplasty in the intercondylar notch has superior rates of meniscus healing in the setting of meniscus repair. It is a standard procedure to perform microfracture chondroplasty (CPT code 29879) with meniscus repair surgeries (29882/29883).

8. If chondroplasty is not performed and the repair fails the patients may need secondary

procedures which may include but not limited to repeat meniscus repair surgery (CPT 29882/29883); or meniscus transplant (CPT 29868). This will lead to a complicated postoperative course for the patient with suboptimal outcome in the long run with possible need for a total knee replacement (CPT 27447) sooner than would have been needed if the primary surgery is successful.

9. An example in the medical literature of the medical necessity of the bone marrow venting procedure (microfracture chondroplasty) is as follows:

Kaminski, et al., Repair Augmentation of Unstable, Complete Vertical Meniscal Tears With Bone Marrow Venting Procedure: A Prospective, Randomized, Double-Blind, Parallel-Group, Placebo Controlled Study, J. Arthro. 2018 11.056.

10. The MedReview report also states that it was "not typical" for the procedure to require two assistants, and concludes that "One operative assistant is customary, usual and reasonable."

11. I was not an assistant surgeon in this case. I was the operating surgeon for this surgery.

I declare under penalty of perjury that the foregoing is true and correct.

July 25, 2022 _____ Vedant Vaksha, M.D.

# EXHIBIT E

Case 2:22-cv-01249-SJB-LGD    Document 84-1    Filed 03/31/26    Page 24 of 30 PageID #: 1011

MAGNACARE  UNION WELFARE LOCAL 202868
PO BOX 1001

GARDEN CITY, NY 115308001

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

[XXX] PICA                                                                                       PICA [XXX]

| | | |
|---|---|---|
| 1. MEDICARE (Medicare#)   MEDICAID (Medicaid#)   TRICARE (ID#/DoD#)   CHAMPVA (Member ID#)   GROUP HEALTH PLAN (ID#)   FECA BLK LUNG (ID#)   OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) | MID0024054 |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
SIDOTE BRIAN

3. PATIENT'S BIRTH DATE  04 16 1987  SEX M [X]  F [ ]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
SIDOTE BRIAN

5. PATIENT'S ADDRESS (No., Street)
201 HIGBIE LN

6. PATIENT RELATIONSHIP TO INSURED
Self [X]  Spouse [ ]  Child [ ]  Other [ ]

7. INSURED'S ADDRESS (No., Street)
201 HIGBIE LN

CITY  WEST ISLIP  STATE NY

8. RESERVED FOR NUCC USE

CITY  WEST ISLIP  STATE NY

ZIP CODE 117952809  TELEPHONE (Include Area Code) (631) 7861732

ZIP CODE 117952809  TELEPHONE (Include Area Code) (631) 7861732

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)  YES [ ]  NO [X]

a. INSURED'S DATE OF BIRTH  04 16 1987  SEX M [X]  F [ ]

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?  YES [ ]  NO [X]  PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?  YES [ ]  NO [X]

c. INSURANCE PLAN NAME OR PROGRAM NAME
MAGNACARE  UNION WELFARE LOCAL

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  YES [ ]  NO [X]  If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  SIGNATURE ON FILE  DATE  07 29 2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  06 16 2021  QUAL. 431

15. OTHER DATE  QUAL.  MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM  TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
17a.
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM  TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  YES [ ]  NO [X]  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind. 0
A. M25562  B.  C.  D.
E.  F.  G.  H.
I.  J.  K.  L.

22. RESUBMISSION CODE  ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 06 16 21  06 16 21 | 22 | | 29883 | 59 LT | A | 99756 32 | 1 | | NPI | 1760762033 |
| 06 16 21  06 16 21 | 22 | | 29879 | LT | A | 58682 32 | 1 | | NPI | 1760762033 |
| | | | | | | | | | NPI | |
| | | | | | | | | | NPI | |
| | | | | | | | | | NPI | |
| | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  462667021  SSN [ ] EIN [X]

26. PATIENT'S ACCOUNT NO.  7445V21645

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  YES [X]  NO [ ]

28. TOTAL CHARGE  $ 158438 64

29. AMOUNT PAID  $ 0 00

30. Rsvd for NUCC Use  158438 64

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
VEDANT VAKSHA, MD
SIGNED  07 29 2021  DATE

32. SERVICE FACILITY LOCATION INFORMATION
AA MEDICAL P.C.
50 NY 25 A
SMITHTOWN NY 117873448
a. 1982663423  b.

33. BILLING PROVIDER INFO & PH # ( )
AA MEDICAL, P.C.
PO BOX 27140
BELFAST ME 049152023
a. 1093150385  b.

DOCUMENT

7445

# EXHIBIT F

Case 2:22-cv-01249-SJB-LGD    Document 84-1    Filed 03/31/26    Page 27 of 30 PageID #: 1014

## AA MEDICAL
## 2500 NESCONSET HWY
## BUILDING 10 UNIT D
## STONY BROOK, NY 11790

Date:    09/28/2021

ATTENTION: APPEAL DEPARTMENT                    FAX 845-336-7989

| |
|---|
| PATIENT : BRAIN SIDOTE |
| ID #  MID0024054 |
| TAX ID NUMBER:  462667021 |
| OUR RECORDS INDICATE THAT CLAIMS FOR THE ABOVE ID NUMBER AND TAX ID NUMBER WERE UNDERPAID.  WE ARE REQUESTING THAT YOU SEND THE PLAN DOCUMENTS FOR THIS PATIENT. PLEASE CONSIDER AS AN APPEAL FOR ALL CLAIMS ON THIS PATIENT. |
| PLEASE CONTACT ME IF YOU HAVE ANY FURTHER QUESTIONS |
| THANK YOU, |
| DONNA AIELLO, BILLING ADMINISTRATOR |
| EMAIL: BILLING@CORTHO.ORG |
| (631)237-3913 |
| FAX #(212)203-9223 |
| |
| |
| |

# EXHIBIT G

Case 2:22-cv-01249-SJB-LGD   Document 84-1   Filed 03/31/26   Page 29 of 30 PageID #: 1016

## AA MEDICAL
## 2500 NESCONSET HWY
## BUILDING 10 UNIT D
## STONY BROOK, NY 11790

**Date:** 12/15/2021

ATTENTION: IRON WORKERS CLAIM DEPARTMENT

| | |
|---|---|
| PATIENT: BRIAN SIDOTE | DOB: 04/16/1987 |
| ID NUMBER : MID0024054 | |
| CLAIM #    1993382 | DOS: 06/16/2021 |
| PROVIDER: VEDANT VAKSHA, MD | |
| TAX ID NUMBER: 462667021 | |
| OUR RECORDS INDICATE THAT THE ABOVE CLAIM HAS BEEN UNDERPAID. WE REQUEST THAT THE CLAIM BE SENT BACK FOR REVIEW. IN ADDITION WE HEREBY MAKE A FORMAL REQUEST FOR THE CERTIFICATE OR SUMMARY PLAN DESCRIPTION (SPD) APPLICABLE TO THE HEALTHCARE PLAN GOVERNING THIS CLAIM. YOU ARE REQUIRED TO MAKE THIS DOCUMENT AVAILABLE TO US. | |

| |
|---|
| THANK YOU, |
| DONNA AIELLO, BILLING ADMINISTRATOR |
| EMAIL: BILLING@CORTHO.ORG |
| (631)237-3913 |
| FAX #(212)203-9223 |
| |